Argued February 13, affirmed September 23, 1959

# GALER *v.* WEYERHAEUSER TIMBER CO. ET AL

344 P. 2d 544

*Nels Peterson*, Portland, argued the cause for appellant. On the brief were Peterson and Pozzi, Berkeley Lent and Philip A. Levin, Portland.

*Robert Mautz*, Portland, argued the cause for respondent Weyerhaeuser Timber Co. On the brief were Mautz, Souther, Spaulding, Denecke & Kinsey, Portland.

*Ray Mize*, Portland, argued the cause and filed the brief for respondents Bonn and Beaver.

*Richard E. Kriesien*, Portland, argued the cause for respondent Hunter. On the brief were Meindl, Mize & Kriesien, Portland.

ROSSMAN, J.

This is an appeal by the plaintiff, Earl F. Galer, from a judgment which the circuit court entered in favor of the defendants, five in number, after the jury had returned its verdict in favor of four of the defendants and a directed verdict in favor of the fifth, Otto G. Benefiel. The defendants are (1) Weyerhaeuser Timber Co., (2) R. S. Bonn and J. H. Beaver, and (3) Herbert E. Hunter and Otto G. Benefiel. The defendant Weyerhaeuser Timber Co., to whom we will refer as Weyerhaeuser, was the plaintiff's employer. The defendants Bonn and Beaver constitute a partnership which engaged in the pipe fitting business. The defendants Hunter and Benefiel were journeymen pipefitters who worked for wages. Benefiel has made no appearance in this court. In his complaint the plaintiff sought damages on account of an injury which he incurred December 18, 1952, while working in the pulp mill of the Springfield plant of Weyerhaeuser. According to the complaint, the plaintiff had ascended a tubular scaffold, defectively constructed, and had fallen from it.

The plaintiff presents seven assignments of error. The first and second are based upon requested instructions that were not given. The third, fifth, sixth and

seventh challenge instructions that were given. The fourth complains of a ruling which sustained the defendants' objections to a document which the plaintiff sought to introduce as evidence. The seven assignments of error present two main issues which the plaintiff's (appellant's) brief phrases in this manner:

"One of the issues submitted was whether a crew of pipefitters, carried on the payroll by Bonn and Beaver, were in reality Bonn and Beaver employees, or had been loaned to Weyerhaeuser for the purpose of doing work in connection with the installation of machines called foam eliminators in certain tanks of Weyerhaeuser's, known as footboxes. Another issue was whether the plaintiff was the foreman in charge of this crew, or merely had the duty of seeing to it on behalf of Weyerhaeuser that the work met Weyerhaeuser's specifications."

The plaintiff contends that the pipefitters, who are mentioned in the quotation, were the employees of Bonn and Beaver. He denies that they had been loaned to Weyerhaeuser. His brief, for example, in referring to the defendants Hunter and Benefiel, who the plaintiff avers were two of the pipefitters who erected the scaffold, says, "it is 'indisputable' that Hunter and Benefiel, who erected the scaffold, were not loaned employees." The plaintiff concedes that he was the foreman of Weyerhaeuser's crew of maintenance pipefitters, but asserted that he was not the foreman of the crew of pipefitters who were engaged in the installation of the foam eliminators, some of whom erected the scaffold.

The complaint alleged that (a) the defendant Weyerhaeuser was the plaintiff's employer and the owner of the scaffold, (b) the defendants Bonn and Beaver were a partnership which, as "contractors or subcontractors," was engaged "in the repairing and

alteration of a certain building and equipment in the pulp mill of defendant" Weyerhaeuser, and (c) Bonn and Beaver "employed" the defendants Hunter and Benefiel. The complaint alleged that the scaffold "had been erected by said employees of Bonn and Beaver."

The complaint made separate charges of negligence against (a) Weyerhaeuser, (b) Bonn and Beaver and (c) Hunter and Benefiel. It alleged that Weyerhaeuser was negligent in:

1. Furnishing planks for the scaffold that lacked cleats upon their lower side so as to prevent the planks from slipping off the upper horizontal bars of the scaffold,

2. Failing to provide a reasonably safe place in which the plaintiff could perform his work inasmuch as a plank of the scaffold was not fitted with cleats and bore a substance that rendered it slippery,

3. Neglecting to inspect the scaffold during its erection, and

4. Neglecting to use every care, device and precaution to render the work safe in accordance with the demands of ORS 654.305.

The complaint charged that the defendants Bonn and Beaver were negligent in:

1. Placing on the scaffold a plank which was not fitted with cleats so as to prevent it from slipping off the horizontal bar,

2. Using a plank which lacked cleats and which bore a slippery substance, and

3. Neglecting to inspect the planks prior to the time that the plaintiff was required to walk upon them.

The complaint averred that Hunter and Benefiel were negligent in placing on the scaffold a plank that lacked cleats so as to prevent it from slipping off the scaffold's horizontal bar.

Weyerhaeuser's answer, after denying all charges of negligence, admitted that (1) defendants Bonn and Beaver were partners, (2) defendants Bonn and Beaver "employed defendants Hunter and Benefiel," (3) Bonn and Beaver at the time of plaintiff's injury "were engaged in a job" in Weyerhaeuser's plant, and (4) Bonn and Beaver's employees, including Hunter and Benefiel, erected the scaffold which the complaint mentions. Affirmatively, Weyerhaeuser's answer alleged that if there was any failure to have complied with the demands of due care or of any statute, "the same was the responsibility of the plaintiff who was the foreman in charge of the particular work and operation for this defendant."

The answer of the defendants Bonn and Beaver denied the complaint's averments of negligence. It admitted that Bonn and Beaver were "sub-contractors in performing certain piping work in the pulp mill of the defendant Weyerhaeuser * * * and that Herbert E. Hunter and Otto G. Benefiel were employed by these answering defendants." The answer charged the plaintiff with negligence.

The defendants Hunter and Benefiel joined in an answer which denied the charges of negligence and admitted that those two defendants were employed by Bonn and Beaver. It charged the plaintiff with contributory negligence.

The transcript of evidence covers 450 pages and is accompanied by numerous exhibits. The thorough manner in which the facts were developed apparently afforded the jury a good impression of the case. We will now mention pertinent evidence.

Weyerhaeuser's Springfield plant includes a large mill which produces pulp and paperboard. At the time

of the plaintiff's injury the pulp mill was undergoing extensive alterations which were designed to increase its output. That work, however, is of only indirect importance in this case. In the early part of December 1952 the pulp mill closed for a few days so that annual maintenance work, which could not be performed while the mill was in operation, could be done. A part of the work which Weyerhaeuser desired to perform in the shut-down period was the installation of a foam eliminator in each of two large steel tanks known as footboxes which were a part of the pulp mill. The installation of the foam eliminators was not a part of the expansion program. The tanks were 22 feet in diameter and 28 feet high. In order to install the foam eliminators in the tanks the workmen were required, among other operations, to cut openings in the steel tanks. The services of pipefitters were essential to the project. It was planned to begin this work Monday, December 15, 1952. Weyerhaeuser maintained a crew of maintenance pipefitters, fourteen in number, throughout the year, but in the December shut-down period those men had sufficient other work awaiting them that they were not able to install the foam eliminators. The plaintiff was foreman of the crew of pipefitters just described. How to obtain the pipefitters who were needed to install the foam eliminators was a problem that had to be solved. Seemingly, due to union regulations, Weyerhaeuser was unable to obtain the needed pipefitters from the union upon its (Weyerhaeuser's) request to that body.

The expansion work in the pulp mill, which we have mentioned, was being executed by the Hoffman Construction Co. Pipe fitting was a part of that undertaking and a firm composed of the defendants R. S. Bonn and H. J. Beaver had a subcontract from Hoff-

man to perform it. Beaver and Bonn's foreman in charge of the pipe fitting work was Hugh B. Leedle.

The plaintiff swore that in the fall of 1952, some time before work was begun upon the installation of the foam eliminators, he, Bonn, Leedle, the mill manager, the mechanical inspector and the carpentry foreman held a meeting in which the work of installing the foam eliminators was planned. Weyerhaeuser had divided the operation of its Springfield plant into departments and had entrusted each department to a department head such as mill manager, plant manager and pipefitter foreman. The department heads met from time to time in business meetings in the course of which they sought to resolve their problems and inaugurate new undertakings. The plaintiff swore that he stated in the course of the meeting just mentioned that preceded the installation of the foam eliminators that his maintenance crew of pipefitters would not have time during the shut-down period to install the foam eliminators and that fifteen additional pipefitters would be necessary to perform the undertaking. He also testified that it was agreed in the course of the meeting that "Beaver and Bonn would hire a crew of pipefitters and bring them into the plant and put them on their payroll and that this crew would be put over in this area to make the installation of the foam eliminators." According to him, Bonn declared at that time that his firm was unfamiliar with the installation of foam eliminators and that since he (the plaintiff) had installed one "they told me to follow that job and see that they were installed according to the specifications agreed on." Thus, the plaintiff claimed that he was to show the crew of Bonn and Beaver how to install the foam eliminators and inspect their work, but was not to be its foreman.

Hugh B. Leedle, who we have said was the pipe fitting foreman of Beaver and Bonn, testified that he received in December a request from William Pittam, Weyerhaeuser's mill engineer, to furnish Weyerhaeuser with a crew of fifteen pipefitters to do some work during the shut-down period. He added that he thereupon "contacted the business agent for the United Association of Plumbers and Steamfitters and asked whether it would be possible for him to furnish us men that I could turn over to Earl Galer for to do maintenance work." The business agent replied in the affirmative. Leedle swore that Monday, December 15th, the business agent presented to him fifteen pipefitters saying in so doing, "here was his men that he was looking for, needing so badly." Leedle testified that he secured from each man the information needed for the federal withholding tax and

"Q * * * you would get their Social Security number—

"A That's right.

"Q —for the purpose of paying Social Security—

"A That's right

"Q —so Beaver and Bonn would pay Social Security—

"A That's right.

"Q —on those workmen?

"A Yes."

The men were carried on the payroll of Beaver and Bonn.

We see from the foregoing that in December 1952 three crews of pipefitters were at work in the pulp mill. One of the three was the regular maintenance crew. The plaintiff concedes that he was its foreman. It, however, did not erect the scaffold and did no work

concerning the foam eliminators or steel tanks. No one claims that that crew was responsible for the plaintiff's injury. The second of the crews was the one which all concede was in the employ of Beaver and Bonn. It was engaged in the expansion work, but, like the maintenance crew, its members performed no work upon the tanks, scaffold or foam eliminators. That crew had nothing to do with the plaintiff's injury. The third crew is the one which Leedle, the foreman for Bonn and Beaver, obtained from the union. The plaintiff denies that he was its foreman. The defendants assert that he was. Some of its members built the scaffold from which the plaintiff fell. It will be recalled that the complaint avers that the scaffold "had been erected by said employees of Bonn and Beaver." It is, therefore, that crew which is the fulcrum of this case.

Weyerhaeuser maintained as a part of the pulp mill a tool house where those who worked in the plant could obtain upon requisition tools, materials and equipment. It also placed at the avail of its workmen tubular scaffolding which came in sections and which could be readily assembled into a scaffold. The scaffolding material consisted of tubular metal parts and wooden planks. These parts were not kept in the tool house but lay in piles in several places about the pulp mill. No requisition was needed by any one who wished to take some of the parts so that he could erect a scaffold. He helped himself. The plaintiff describes the erection of a tubular scaffold as "simple work."

When a set of tubular parts was fastened together a scaffold was thereby created 6 feet high, 5 feet broad and 7 feet long. Thereupon, the individual who assembled it placed planks over the horizontal bars and thus had a platform upon which he could work. The

planks were kept in the same place as the tubular parts. If the scaffold builder wished a taller scaffold he merely erected a second upon the one which he had already built and thereupon his scaffold was 12 feet high. The planks which Weyerhaeuser provided were of the same length as the scaffold. Most of them were equipped at each of the ends on the lower side with a cleat made of wood which prevented the plank from slipping from the horizontal bar of the scaffold. No one claims that Weyerhaeuser did not render available to the men an adequate supply of cleated planks. Photographs of piles of the planks, that are a part of the record, show that any one by looking at them could readily distinguish the cleated from the uncleated planks. A witness explained the use which was made of uncleated planks. Pipefitters testified that they were familiar with the erection of tubular scaffolds and that they frequently constructed them. They also indicated that they regarded the cleated planks as providing greater safety than the others unless the uncleated ones were fastened in place. A witness explained the manner of fastening the uncleated planks securely. The plaintiff, who had had many years experience in the work of pipe fitting, manifested familiarity with tubular scaffolds, and made no intimation that he was unacquainted with the purpose of cleats. The uncleated plank which caused the plaintiff to fall did not lie upon the top level of the scaffold where the men were working, but upon the level next below it.

Thursday, December 18, at 9 a.m. the plaintiff came to the tanks where the pipefitters were performing the installation work and noticed that a tubular scaffold had been erected. None was there the evening before. The defendant Herbert E. Hunter, one of the pipefitters whom Leedle had secured through the union,

testified that he helped to erect the scaffold. He was at work upon it when the plaintiff arrived upon the scene. The plaintiff testified that he had nothing to do with the erection of the scaffold and had given no orders concerning it. It will be recalled that the complaint, referring to some of the members of the crew that was installing the foam eliminators, says that the scaffold was "erected by said employees of Bonn and Beaver." When the plaintiff reached the scaffold he noticed that the men upon it were preparing to cut a large pipe that served the tank. The view which he gained from the place where he stood caused him to infer that the cutting was unnecessary and that it would destroy valuable material. He thereupon asked the men to desist and proceeded to ascend the scaffold so that he could obtain a better conception of the difficulty and make suggestions for its solution. When he reached the level of the scaffold immediately below that upon which the men were working his foot gave way when it encountered a slippery substance upon one of the planks. That plank lacked cleats and as the plaintiff sought to prevent his fall, the plank toppled from the scaffold and he fell to a lower level.

We see from the foregoing that the averments of plaintiff's pleadings as well as his testimony as a witness denied that Weyerhaeuser constructed the scaffold. The plaintiff swore that pipefitters in the employ of Beaver and Bonn erected it. Further, according to him, those men had not been loaned to Weyerhaeuser and he was not their foreman. He testified that the foreman of the crew of pipefitters that was installing the foam eliminators and that had erected the scaffold was one John Houk. The latter was one of the fifteen pipefitters that Leedle secured from the union office on Monday morning, December 15. Due to union regu-

lations a lead man must be appointed for a crew of pipefitters whenever the crew consists of three or more members. The lead man receives more pay than the others and is the individual to whom the owner or general contractor normally speaks when he wishes to direct the crew in its work. Likewise, the lead man assists the other members of the crew in their work. The plaintiff swore, as we have said, that Houk was the foreman of the crew that was installing the foam eliminators.

The above will suffice for present purposes as a statement of the facts.

The first assignment of error is based upon the trial judge's refusal to give to the jury the following instruction:

"You are instructed that it is the personal and absolute duty of the employer to exercise reasonable care and caution to provide his employees with reasonably safe tools, apparatus and instruments to work with. This duty is a duty which the employer cannot delegate to an employee of any grade so as to exempt the employer from liability to an employee who has been injured by non-performance of such duty. (Mast v. Kern, 34 Or. 247, Anderson v. Bennett, 16 Or. 515, Pond v. Jantzen Knitting Mills, 183 Or. 255, and 35 Am. Jur., Master and Servant, Section 138, page 569.)

"In this case if you find that the defendant Weyerhaeuser Timber Co., a corporation, as the employer of the plaintiff, Earl F. Galer, violated its duty in one or more of the particulars as set forth in plaintiff's Amended Complaint, and that such breach of duty was the proximate or contributing cause of injuries to the plaintiff, Earl F. Galer, then your verdict will be in favor of the plaintiff, Earl F. Galer, and against the defendant, Weyerhaeuser Timber Co."

The foregoing review of the record indicates clearly that the plaintiff claimed throughout the trial that no employee of Weyerhaeuser erected the scaffold. His complaint alleged that the scaffold was erected "by said employees of Bonn and Beaver," and the plaintiff so maintained as a witness. Referring to the very factor which the plaintiff says caused his injury, to wit, the use of an uncleated plank, the complaint charged Beaver and Bonn with negligence "in placing on said scaffolding a planking which was not fitted with a cleat on each end." In its specification of the purported negligence of Hunter and Benefiel, who the plaintiff says were employees of Bonn and Beaver, the complaint attributed to them negligence "in placing on said scaffolding a planking which was not fitted with a cleat on each end * * *."

It will be noticed that the requested instruction stated that if the jury found that Weyerhaeuser "violated its duty in one or more of the particulars as set forth in plaintiff's Amended Complaint" and that the breach was the proximate cause of plaintiff's injury, the jury's verdict must be in his favor and against Weyerhaeuser. A preceding paragraph of this opinion states the four specifications of negligence which the complaint presents against Weyerhaeuser. They are:

1. "* * * furnishing a planking for said scaffolding not fitted with cleats * * *,"

2. "* * * neglecting to provide a reasonably safe place for this plaintiff to carry on his work in that the planking on said scaffolding was not fitted with cleats * * * and in that the said planking was slippery from liquid * * *,"

3. "* * * neglecting to inspect said scaffolding * * * during its erection * * *," and

4. Neglecting to use every care, device and pre-

caution for the promotion of safety as required by the "and generally" clause of the Employers Liability Act.

If the complaint, by using the word "furnishing" in its first specification of negligence, meant to charge that Weyerhaeuser handed to or chose for the scaffold builders a plank that had no cleats, the evidence is lacking upon the subject. The record indicates that Weyerhaeuser knew nothing of any one's intention to erect a scaffold incidental to the installation of the foam eliminators. Its first knowledge that the scaffold was to be or had been erected came to it when the plaintiff, as its representative, saw the completed structure a few moments before his injury. Weyerhaeuser rendered cleated and uncleated planks available to those who wished to erect a scaffold and permitted them to select any of the planks according to their preferences. The plaintiff conceded that he was the one who told the crew of Beaver and Bonn, that installed the foam eliminators, that scaffold material was available and showed them where it could be found. He did so on Monday morning, December 15. In the following excerpt, taken from his testimony, the reference of the pronoun "him" is to Houk, who the plaintiff says was the foreman of the crew that installed the foam eliminators.

"A I told him that there was a pile of scaffolding approximately one hundred feet from where he was starting this job and that when he got ready for scaffolding he could use that if it was still there.

"Q Fine.

"A And if it wasn't still there he could go anywhere around there if scaffolding was erected and if there was no one using it he would dismantle that scaffolding and erect it to suit himself."

No one else connected with Weyerhaeuser, so far as the record indicates, said anything to the pipefitters about scaffolds or the material available for their construction. Accordingly, if any one connected with Weyerhaeuser "furnished a planking" to the crew it was the plaintiff himself.

No one claims that Weyerhaeuser or anyone in its employ suggested to the crew of Beaver and Bonn that they use an uncleated plank in the construction of the scaffold or that Weyerhaeuser failed to render available a sufficient number of cleated planks. The most that can be said is that Weyerhaeuser placed at the disposal of those who needed scaffold material some planks that were not cleated.

The plaintiff concedes that he was foreman of Weyerhaeuser's crew of maintenance pipefitters. His brief, in arguing this assignment of error, states:

"* * * He did not contest the fact that his position with defendant Weyerhaeuser was that of mechanical pipe fitter foreman. * * *"

As a witness the plaintiff admitted that it was his duty as foreman to take precautions so that all pipe fitting work entrusted to him and his crew would be done in a safe manner. For example, he testified that it was a foreman's duty "to see that his crew works safely." It was also his duty, so he added, to see to it that the crew had proper materials and supplies. By returning to the requested instruction it will be noticed that if it had been gvien it would have told the jury that Weyerhaeuser owed a duty "to provide his employees with reasonably safe tools, apparatus and instruments to work with." The plaintiff's own testimony of which we have taken notice renders it clear that Weyerhaeuser had entrusted him with the responsi-

bility of seeing to it that the alleged neglect, which he says occurred, would not happen, and that the crew would work in safety. He even showed the crew of Beaver and Bonn, which he says erected the scaffold, where it could obtain all of the tools, supplies and equipment which it needed.

Plaintiff admits that Weyerhaeuser had only one pipefitter foreman and that he was that person. His status was that of vice-principal. As such he had all the authority in matters pertaining to the work-safety of pipe fitting that Weyerhaeuser possessed. He was, in truth, the defendant Weyerhaeuser Timber Company. As a part of his duties as pipefitter foreman he agreed to show the crew of Beaver and Bonn how to install the foam eliminators and also to inspect their work as they progressed with it. Since he was not, according to his version, the foreman of the crew of Beaver and Bonn he owed no duty to take precautions for that crew's safety. Nevertheless, he owed the duty of which we have taken notice to protect the safety of his maintenance crew of which he was a member.

When the plaintiff, upon the morning of his injury, saw the Beaver and Bonn crew of pipefitters about to engage in work which he questioned and which he wished to examine before they proceeded further, he was not required to ascend the scaffold without inspecting it or assuring himself in some other way that it was safe. Had he at that moment sent one of his crew of maintenance pipefitters up the scaffold, he would have owed a duty to have seen that the scaffold was safe. He owed no less a duty to himself. Accordingly, if he neglected a duty on the morning of his injury which he now wishes to charge to Weyerhaeuser as a basis for this action, the neglect was his own. The defendant Weyerhaeuser Timber Company, being an

impersonal inanimate entity, was forced to resort to individuals, like the plaintiff, to perform its functions and duties. It was his duty to see to it that the neglect of which he complains did not occur.

1. ORS 654.305, being a part of the employer's liability law which the complaint mentions, says:

"Generally, all owners * * * and other persons having charge of, or responsible for, any work involving a risk or danger to the employes or the public, shall use every device, care and caution which it is practical to use for the protection and safety of life and limb * * *."

ORS 654.315 provides:

"The owners, * * * foremen * * * or other persons having charge of the particular work, shall see that the requirements of ORS 654.305 to 654.335 are complied with."

That provision of our laws in unmistakable terms imposes upon all who have the status of foreman the same duty that it exacts of owners and employers, that is, the duty of seeing to it that the act's safety measures "are complied with." For that purpose it renders the foreman a vice-principal. It prescribes in ORS 654.-990 (5) a criminal penalty for those such as foremen who are convicted of the act's violation.

From the foregoing we see that the plaintiff had not only all of the authority over safety that Weyerhaeuser had conferred upon him but in addition had that which the employers' liability law implies foremen must possess. If the failure to have discovered the presence of the uncleated plank upon one of the lower levels of the scaffold was an act of negligence, then the negligent act was that of the plaintiff. He wishes to charge that act to Weyerhaeuser and have his par-

ticipation in it be deemed as nothing more than contributory in nature.

The plaintiff argues that if it is held that he can not recover it will be necessary to ignore the rule that the duties imposed upon employers and owners by the employers' liability law are non-delegable. In *Howard v. Foster and Kleiser Company*, 217 Or 516, 332 P2d 621, 342 P2d 780, we pointed out that the "non-delegable" phase of the statute has meaning only if an employer tries to escape from liability to an employee by asserting that it had delegated the duty imposed upon it by the act to a foreman, and thereafter owed no duty to the employee. The reason why such a contention can not succeed is that the foreman is an agent of the employer, and the latter is liable for his acts. If the latter are negligently performed and injure another, the employer is liable to the injured employee. The liability is predicated upon the doctrine of respondeat superior. Through a fiction of law the negligence of the foreman is viewed as that of the employer although the fiction does not relieve the foreman from liability to the victim of his tort. The fiction operates at its best if the employer is a corporation—that is, an impersonal entity. But, if the employer is an individual who negligently performs an act, which the foreman might otherwise have performed, and injures the foreman, the latter may have a cause of action against his employer. But in a situation of that kind, unlike the one at bar, the negligent act was not performed by its victim.

In the case at bar the plaintiff is both the injured party and the tort feasor. After asking that his own negligence be deemed Weyerhaeuser's, so as to establish a basis of recovery against that concern, the plaintiff wishes the court to treat his negligence thereafter

as mere contributory negligence. We ruled in *Howard v. Foster and Kleiser,* supra, that in actions of this character contributory negligence is not a defense.

■ Out of the doctrine of respondeat superior there eventually emerged the vice-principal rule. That rule ordained that one who was a vice-principal or superior servant did not fall within the fellow-servant rule and that unlike the negligence of a fellow servant, the negligence of a vice-principal rendered the employer liable to an employee injured thereby. For that purpose the vice-principal was deemed the alter ego of the employer.

The vice-principal rule with which we are concerned is not one of contributory negligence. The failure of a vice-principal to exercise the required care is not contributory negligence because it is the sole cause of the injury. Without it the vice-principal would not have been injured and there would have been no delict to attribute to the employer.

■■ The plaintiff argues that it would be unreasonable to require a foreman or other vice-principal to discover a defect in a structure such as this scaffold which the employer did not erect. If an employer can not depend upon a vice-principal who has been invested with authority to make the place of employment safe to detect the absence of a cleat from one of the planks, it will be necessary for the employer to hire an additional man to detect such purported defects. If the foreman can not be charged with neglect if he fails to notice the defect, then it seems that the substitute inspector could present in his behalf a similar excuse if he failed to discover the defect. If explanations of that kind succeed it might be necessary for the employer to hire a third or fourth inspector before finally succeeding in having the duty performed. We do not believe that a

vice-principal who has been granted adequate authority, equipment and personnel to discharge his duty can excuse his failure to have discovered a purported defect.

For the reasons expressed in *Howard v. Foster and Kleiser*, supra, we conclude that plaintiff's negligence can not be deemed contributory negligence. It was the principal negligence and the sole cause of his injury. The first assignment of error is without merit.

■ The second assignment of error charges that error was committed when the trial judge refused to charge the jury as follows:

> "You are instructed that it is an absolute duty of an employer to provide a reasonable safe place for this plaintiff to carry on his work. In this respect, if you find that the defendant, Weyerhaeuser Timber Company, a corporation, failed to fit the planking on the scaffolding with cleats so as to have prevented the end of the planking from coming off the horizontal bar upon which it rested, and that such planking was slippery from liquid substances arising from the processing operation, and if you further find that under such circumstances a reasonable and prudent employer would have had said planking on said scaffolding fitted with cleats, then you will find the defendant, Weyerhaeuser Timber Co. was negligent. If you further find that such negligence was a proximate or contributing cause of injury or damage to the plaintiff, then your verdict will be in favor of the plaintiff, Earl F. Galer, and against the defendant, Weyerhaeuser Timber Co."

It is clear that the plaintiff does not claim that Weyerhaeuser built the scaffold or had anything to do with its erection except to render available the materials with which it was built. Weyerhaeuser was not responsible for the presence of the slippery sub-

stance upon the plank. So far as the record indicates, that substance came upon the plank after the latter was brought to the tank. The evidence does not indicate that Weyerhaeuser had any knowledge that the substance was upon the plank. No error was committed when this requested instruction was refused.

The third assignment of error challenges an instruction which stated to the jury the legal principles applicable to the status of loaned employees. For example, it stated:

"* * * if an employer loans a servant to another for some special service, such servant with respect to that special service becomes the servant of the party to whom his services have been loaned. * * *"

The exception to the instruction was expressed in these words:

"The plaintiff excepts to the proviso added on as to the liability of Beaver and Bonn under the loaned employee theory. I submit there is no evidence or no presentable legal theory under a loaned employee theory."

The plaintiff insisted throughout that the pipefitter crew which Leedle secured from the union and which proceeded with the installation of the foam eliminators were the employees of Beaver and Bonn. The defendants, upon the other hand, claimed that that crew had been loaned to Weyerhaeuser and that the latter was its employer. The plaintiff's (appellant's) brief says:

"* * * There was evidence in support of plaintiff's theory, which was that Beaver and Bonn were in control of the employees, who were on their payroll (Tr. 161, 225) and were working under the supervision of a Beaver and Bonn foreman (Tr. 57, 116, 117, 226, 310, 325, 391). There was also evi-

dence in support of the theory of these defendants' that the employees in question had been loaned to Weyerhaeuser for the purpose of this job (Tr. 266, 267, 271, 349)."

The excerpt just quoted makes it apparent that notwithstanding the plaintiff's exception to the challenged instruction there was substantial evidence in support of the defendants' loaned employee theory. The issue as to whether the pipefitters which Leedle obtained from the union were the employees of Beaver and Bonn or whether they were loaned to Weyerhaeuser was probed at length during the trial. The plaintiff's present position induces the inference that the exception which he took to the instruction did not disclose adequately the basis upon which he now wishes to attack the instruction. An exception to an instruction which does not reveal to the trial judge a purported defect which the appellant upon appealing makes the subject matter of attack upon the instruction affords the trial judge no opportunity to correct the instruction, assuming that the exception possesses merit. A party upon excepting must make known to the trial judge the specific objection which he wishes to present upon appeal. *Garrett v. Eugene Medical Center*, 190 Or 117, 224 P2d 563; *Wilson v. State Industrial Accident Commission*, 189 Or 114, 219 P2d 138; *Lee v. Hoff*, 163 Or 374, 97 P2d 715; *Weinstein v. Wheeler*, 141 Or 246, 15 P2d 383. It is our belief that the instruction is not subject to the purported defect which was mentioned in the exception. If the plaintiff had something additional in mind when he voiced his exception it can not now be considered upon appeal because it was not called to the attention of the trial judge. We dismiss this assignment of error as lacking in merit.

■ The fourth assignment of error challenges a rul-

ing which sustained the defendants' objections to the admissibility of several parts of a contract which the local labor union, previously mentioned, and the partnership composed of Beaver and Bonn signed. The agreement stated the wages, hours and other working conditions that were applicable to the relationship between the employer and the employees. Although the plaintiff, in addition to offering in evidence the part of the agreement to which we will presently give attention, offered two other parts which seemingly were inadmissible, we will not rest our decision upon that fact. The agreement contained this provision:

"No member will be allowed to be loaned from one employer to another employer. After a member has worked for one shop or firm a continuous work week, he shall not work for another firm until his employment has been terminated with first shop or firm."

Referring to that provision plaintiff's counsel, when the instrument was offered, said:

"I offered it in rebuttal to show there can't be any loaned employees in this case."

It will be recalled that when the crew of fifteen pipefitters was sought to install the foam eliminators Mr. Leedle, the foreman of the crew of pipefitters that was helping to increase the output of the pulp mill, requested the business manager of the local union to provide a crew of fifteen pipefitters for Weyerhaeuser. The uncontradicted and unchallenged testimony shows that the union official replied that he would provide the crew. Upon the appointed day, according to further testimony which is unchallenged, he presented the men to Leedle who in turn delivered them to the plaintiff. Thus, the business manager of the union, when he recruited the crew, knew that Leedle sought them for

Weyerhaeuser. The men, however, were carried upon the payroll of Beaver and Bonn.

One of the provisions of the agreement between the union and Beaver and Bonn says:

> "Ten men shall be considered a crew or gang, however, the Foreman may supervise up to twelve (12) men, but when thirteen (13) men are employed, the crew or gang shall be divided and another Foreman appointed."

The crew which the union provided consisted of fifteen men. Only one foreman served it. Seemingly, the provision just quoted was not observed. We do not believe that the provisions of the contract between the union and Beaver and Bonn were admissible for the purpose of establishing the plaintiff's contention that the members of the union could not be loaned from one employer to another. The uncontradicted evidence shows that the union business manager was informed of the very relationship which it was proposed to create when he supplied the men. No error was committed when the challenged ruling was made.

■ The fifth assignment of error challenges an instruction which told the jury in part:

> "If you find from a preponderance of satisfactory evidence herein that it was the duty of the plaintiff as pipefitter foreman to see that all necessary safety requirements in connection with the erection and maintenance of the scaffolding on which he was injured were complied with, then and in such event plaintiff cannot recover in this case against defendant, Weyerhaeuser Timber Company under the provisions of the Employers' Liability Act.
>
> "It is the law of this state that an employee to whom has been assigned the duty of rendering an operation safe has no cause of action under said

Employers' Liability Act against his employer if he is injured through a defective condition resulting from his failure to perform his duty.

"You are, therefore, instructed that if you find from the evidence that it was the duty of the plaintiff to see that the work was performed in a safe manner, and you further find that the accident was caused by the failure to perform the work in a safe manner and that was the sole cause of the accident as far as the defendant Weyerhaeuser Timber Company is concerned then the plaintiff cannot recover against the said defendant."

The instruction went on and elucidated the meaning of the paragraphs just quoted, but did not depart from their implications.

The plaintiff's (appellant's) brief says:

"In presenting this Argument, plaintiff wishes to make clear the fact that he is aware that the above-quoted instructions are in conformity with the rule of law as laid down in *Marks v. Bauers*, 3 F2d 516 (CCA 9, 1925); *Schmidt v. Multnomah Operating Co.*, 155 Or 53, 61 P2d 95 (1936); and *Straub v. Oregon Electric Ry. Co.*, 163 Or 93, 94 P2d 681 (1939). If those cases correctly state the law with respect to the liability (or rather, non-liability) of an employer to a foreman under the Oregon Employers' Liability Law, then the instructions given are correct. * * *"

The plaintiff's (appellant's) brief analyzes the three decisions just cited and argues that they were wrongly decided. We have given his contentions careful attention. In view of the analysis set forth in preceding paragraphs of this opinion and other attention given to similar arguments in *Howard v. Foster and Kleiser*, supra, we believe that the three cited decisions were correctly decided. It must be borne in mind that Weyerhaeuser furnished the plaintiff with all the tools, ap-

pliances and equipment that were necessary so that he could fully discharge the responsibilities he had undertaken. It also provided him with the necessary staff and authority that was needed for the safe conduct of the work. He would not have been injured had he given the necessary attention to his duties. This assignment of error is, in our belief, without merit.

The sixth assignment of error is predicated upon an instruction which was substantially similar to the one which we quoted in our disposition of the fifth assignment of error. It stated in part:

"* * * if he was injured as a result of his failure to use proper care as the vice-principal of the corporate employer, then his injuries would be caused by his own wrong and he cannot recover in this case against his employer * * *."

The plaintiff calls attention to the fact that contributory negligence is not a defense in cases of this character. However, since the plaintiff was a vice-principal his neglect was not contributory but the sole cause of his injuries. This assignment of error is without merit.

The seventh, being the last assignment of error, attacks the following instruction which was given to the jury:

"In determining whether plaintiff has sustained this burden of proof that evidence is deemed satisfactory only if it produces moral certainty or conviction in an unprejudiced mind. Only evidence which produces such moral certainty or conviction is sufficient to justify a verdict, any evidence less than this being insufficient."

*Cook v. Michael,* 214 Or 513, 330 P2d 1026, held that an instruction of substantially similar kind was errone-

ous. That decision was announced after the instruction above quoted had been given to the jury. Accordingly, error was committed when the challenged instruction was given, but the question remains whether the error calls for reversal.

The instructions given to the jury in the case at bar were comprehensive. As transcribed, they cover 37 pages of the transcript. They repeatedly told the jury that wherever the evidence was contradictory the verdict must be in accordance with the preponderance of the evidence. In more than one place they added:

"It matters not how small that preponderance may be."

In one place the instructions declared:

"Yet, if he produces stronger or more credible proof than is produced by his opponent by ever so small a degree, the party making the allegation is entitled to prevail upon that particular issue. Preponderance of the evidence means the greater weight of the evidence.

"On the other hand, if the party making the denial or holding the negative of an issue produces as good and credible proof as the one holding the affirmative, or makes the better case of the two, the negative is entitled to prevail."

After a careful review of the pleadings the instructions pointed out to the jury that the plaintiff made two basic charges against the defendants, (1) negligence and (2) injury. They declared that since the defendants denied the charges:

"* * * the plaintiff has the burden of proof and he must satisfy you in regard to that burden of proof by proving by a preponderance of the evidence those two things."

After those instructions had been given, the trial

judge included the one about satisfactory evidence and moral certainty which is the subject matter of this assignment of error.

After that erroneous instruction had been given, the instructions declared that before the jury could return a verdict against Weyerhaeuser they must be satisfied "by a preponderance of the evidence" that it was guilty of one or more charges of negligence set forth in the complaint. A similar instruction was given as to the charges of negligence made against Beaver and Bonn as well as those made against the other defendants. Shortly, the instructions added:

> "After considering all the evidence in this case, if you find that the evidence is evenly balanced between the plaintiff and the defendant, Weyerhaeuser Timber Company, and that you can not say upon which side the evidence preponderates or weighs the heavier, then the plaintiff has not proven his case to you by a preponderance of the evidence."

Upon the contention that Beaver and Bonn loaned the crew of pipefitters to Weyerhaeuser, the instructions stated:

> "If you find from a preponderance of evidence in this case that the defendants Bonn and Beaver loaned their crew to the defendant Weyerhaeuser to perform services for Weyerhaeuser in connection with the installation of the foam eliminators, then and in that event any negligence of the servants so loaned to Weyerhaeuser * * *."

Shortly, the instructions told the jury:

> "I have spoken to you of the preponderance of the evidence. Preponderance of the evidence means the greater weight of the evidence; not necessarily the greater number of witnesses nor the greater volume of evidence, but the more convincing evidence, and if upon any issue in this case the evi-

dence appears to you to be evenly balanced, or you can not say upon which side it weighs the heavier, you should resolve that issue against the party upon whom the burden of proof rests, bearing in mind that the burden of proof rests upon the plaintiff to establish by a preponderance of the evidence his charges of negligence which he, the plaintiff, makes against the defendants; also, to show by a like preponderance of the evidence that that negligence was the proximate cause of the injury for which he seeks redress in damages."

That instruction was given after the one which is the subject matter of this assignment of error. The instructions had also told the jury:

"You are to look for the quality of evidence as well as the number of those testifying."

The instructions stated to the jury in detail the plaintiff's charges of negligence not only against Weyerhaeuser but also those which the plaintiff made against Beaver and Bonn as well as the other two defendants. In each instance they instructed the jury that the issue was to be resolved by a preponderance of the evidence.

Although the challenged instruction should not have been given, nevertheless, as we have seen, it was not the only definition given to the jury as to the meaning of "preponderance of the evidence."

The issues of fact were few. Although the plaintiff's case against Weyerhaeuser was submitted to the jury it may well be that the court would have been warranted in directing a verdict for that defendant. It will be recalled that the complaint alleged that Beaver and Bonn, and not Weyerhaeuser, constructed the scaffolding.

The plaintiff's case against Beaver and Bonn included issues as to whether the crew that built the scaffold was in the employ of those two defendants and

as to whether the scaffold was negligently erected. The evidence showing that an uncleated plank bearing a slippery substance was included in the scaffold's construction was not challenged. Likewise, the evidence which showed that the plank was not placed upon the upper level where the men were working but upon a level directly under it was not attacked. The evidence which showed that cleated planks were more safe than uncleated ones was not disputed by any one. Therefore, the issue as to whether or not the scaffold was negligently constructed did not turn upon an issue of fact but upon the inferences that were to be drawn from unchallenged facts. The issue as to whether or not the crew that installed the foam eliminators and constructed the scaffold was in the employ of Beaver and Bonn or in the employ of Weyerhaeuser was very likely the most troublesome. The testimony which showed how the crew was obtained was not contradicted and the veracity of the witnesses who gave it was not questioned. We also note that the evidence which showed that Beaver and Bonn carried the men on their payroll and paid them with that firm's checks was not disputed. Similarly, the issue as to whether Houk was the lead man of the crew or its foreman did not hinge apparently upon a question of veracity but upon the inferences that were to be drawn from it.

It appears to us that the issues before the jury as to Beaver and Bonn must have been resolved through the inferences which the jury drew from facts which were virtually free from dispute.

Although the challenged instruction was erroneous and should not have been given, it did not stand alone. Other instructions which were in harmony with *Cook v. Michael*, supra, probably gave the jury a correct impression of the meaning of the term "preponderance of

evidence." At any rate, we are satisfied that the issues of fact were so few and so unimportant that the erroneous instruction did not mislead. We hold that the error was not prejudicial. Hereafter *Cook v. Michael,* supra, should be followed. The seventh assignment of error affords no basis for reversal.

Affirmed.